2005 SD 54

The PEOPLE of the State of South Dakota in the Interest of C.W., Minor Child and concerning J.R. and G.W., Respondents.

No. 23325.

Supreme Court of South Dakota.

Considered April 14, 2005.

Decided April 27, 2005.

---

Lawrence E. Long, Attorney General, Ann M. Holzhauser, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee State of South Dakota.

Dana J. Frohling and Jason A. Campbell of Spiry & Frohling, Britton, South Dakota, Attorneys for appellant J.R.

Tracy Niemann of Sutton and Bauer Law Office, Watertown, South Dakota, Attorneys for minor child C.W.

PER CURIAM.

[¶ 1.] J.R. appeals the termination of her parental rights over her two-year-old daughter (child). We affirm.

## FACTS

[¶ 2.] Child was born out of wedlock to Watertown residents J.R. (mother), age twenty-one, and G.W. (father) on January 8, 2003.[1] On May 9, the Department of Social Services (DSS) received a call from the hospital reporting that child, then age four months, had fractured both bones in one of her arms and that the parents had no idea how the injury occurred. Child was removed from the parents' custody on May 10, but DSS was unable to determine how child's arm was broken. Child was returned to the parents' custody on June 23.

[¶ 3.] On July 8, 2003, the parents took child to her doctor for a regular checkup. Apparently due to the fracture of child's arm, father asked the doctor for a bone evaluation to determine if there was some sort of problem with child's bone structure. The examination of child was normal and the doctor saw no evidence of any problem.

[¶ 4.] On July 17, 2003, the parents took child to a Wal–Mart store to have her picture taken. The two photographers were familiar with child from having taken her picture during the time she was in foster care and noticed that child had a bruise on her arm and scratches on her back. Although the photographers made no mention of child's injuries, father explained that child had been bruised when he and mother took her to the swimming pool. The day after their encounter with mother and father, the photographers met child's former foster mother who had brought her son to Wal–Mart to have his picture taken. The photographers mentioned seeing child and the bruising and scratches on child's body. The foster mother immediately reported the matter to DSS.

[¶ 5.] DSS sent one of its workers and a law enforcement officer to the home to check on child. The home was in disarray. There was mold in some scattered pots and pans, there were "lots" of dirty dishes, the floor had not been vacuumed, there was garbage and dirt on the floor and the situation appeared to be "chaotic." On examining child, the officer found a very deep dark bruise on the same arm that child had fractured previously. Mother then contacted the DSS office and in-

---

1.  1. Father's age is not made clear by the record.

formed one of the workers that child's bruise was caused by her crib. Father later contacted the same worker and told her the bruise resulted from taking child swimming. Based upon the parents' inconsistent explanations for child's bruises, child's prior unexplained injury and the state of the home, DSS took child into custody.

[¶ 6.] After removing child from the home, DSS took her to her doctor for a physical examination. The doctor identified seven different areas of bruising and lesions on child's body. The largest and worst bruise was on child's forearm close to her elbow. Notwithstanding her injuries, child was not showing distress, moved her arms and legs well and did not evince any other evidence of abnormality.

[¶ 7.] On July 21, DSS took child to the hospital for a skeletal survey. The results and X-rays were reviewed by a child abuse medical screening team in Sioux Falls. A further examination of child, including a bone scan and CT scan, was conducted by the team on August 1. Results of the bone scan showed evidence of healing fractures in child's ribs on both sides of the back of her body. The fractures were approximately two to four weeks old and consistent with the areas of bruising previously identified by child's physician. One of the medical experts later testified at the adjudicatory hearing that it would have required an extreme amount of force to cause the fractures because child's bones were soft and not "fully calcified." Specifically, the doctor testified:

So when you see a fracture in an infant, it requires an extreme amount of force, specifically when you see rib fractures,

especially in the back, it requires an extreme amount of force. Even a fall from a one story building of a baby does not usually result in rib fractures.

[¶ 8.] Both parents admitted that they had been the sole care takers for child.[2] However, the parents failed to provide any consistent explanation for child's injuries. Mother suggested the rib injuries resulted from numerous incidents where father cleared congestion from child's nasal passages by blowing into child's mouth until mucus was ejected from her nose. However, father denied treating child in this manner and medical experts at the adjudicatory hearing dismissed the "treatment" as a source of child's injuries. Father only speculated that the injuries were caused by child rolling over some toys on the floor or bouncing in a "child saucer."

[¶ 9.] The State filed its petition alleging abuse and neglect on July 21, 2003. The adjudicatory hearing was held on October 15, 2003 and, on October 28, the trial court entered findings of fact, conclusions of law and an order adjudicating child to be abused and neglected. The dispositional hearing was held on April 14, 2004 and, on April 30, the trial court entered findings of fact, conclusions of law and an order terminating mother and father's parental rights. Mother appeals.

ISSUE ONE

[¶ 10.] **Was the trial court clearly erroneous in finding child to be abused and neglected?**

[¶ 11.] In its adjudicatory findings of fact and conclusions of law, the trial

---

2.  2. After child's removal, father was incarcerated in a Trustee Unit in Yankton for reasons that are not entirely clear in the record. Father remained incarcerated throughout the course of the trial court proceedings and testified by telephone during the adjudicatory and dispositional hearings. Father has not appealed the termination of his parental rights over child.

court entered the following finding concerning abuse and neglect of child:

> The above-named minor child is abused and neglected through the actions or omissions of the parents, [mother] and [father], within the meaning of SDCL 26–8A–2 based on the following:
>
> > The minor child sustained bruises and broken ribs while in the care of her respondent parents. Parents were not forthcoming about the injuries. The force required to sustain the injuries to this six (6) month old child was either deliberate or at the least negligent. The parents subjected the child to mistreatment and/or abuse and failed to provide proper care.

Mother argues there is insufficient evidence to support the finding of abuse and neglect.

> The State must prove a child is abused and neglected by clear and convincing evidence. The trial court's findings of fact will not be set aside unless they are clearly erroneous and "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

*People ex rel. D.T.*, 2003 SD 88, ¶ 5, 667 N.W.2d 694, 697 (citations omitted). In applying the clearly erroneous standard of review, "this Court does not determine whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed." *People ex rel. C.G.*, 2003 SD 78, ¶ 12, 667 N.W.2d 279, 282.

■ [¶ 12.] Mother argues the evidence is insufficient to support the finding of abuse and neglect because child was cheerful and evinced no distress during her July 18, 2003 medical examination despite the State's evidence indicating that child's ribs were fractured at that time. Mother apparently suggests that child's lack of distress on July 18 shows that child's injuries occurred after that time while child was no longer in the parents' care. However, the child's lack of distress at the July 18 exam was adequately explained by child's doctor during the adjudicatory hearing. The doctor gave the following answer to a question concerning the distress a six-month-old might exhibit as a result of a rib injury:

> There's not a straight yes or no answer to that question. It again depends upon how old the injuries may be at that time, how much injury and in children that age you don't necessarily—you're observing more subtle signs and sometimes you don't see overt distress related to that kind of a fracture. Breathing is a, it depends on a number of different factors but I guess the easiest factor is no, you won't always observe distress related to injured ribs.

[¶ 13.] The physician who screened child for abuse further confirmed that the location of child's broken ribs would not necessarily have caused her any difficulty in breathing. In that regard, the doctor stated:

> the rib fractures were located in the back, okay, they were located on the sides and in the back, not in the front, okay, and so they don't necessarily have breathing difficulties at this age when they are in the back or towards the back, so they may have breathing difficulties but more than likely they will not.

[¶ 14.] Based upon this medical testimony, child's lack of apparent distress during her July 18, 2003 medical examination yields no definite or firm conviction that the trial court was mistaken in its findings concerning the parents' abuse and neglect of child and no basis for reversal of its findings.

## ISSUE TWO

**[¶ 15.] Was the trial court clearly erroneous in finding that DSS made reasonable efforts to reunite mother and child?**

■ [¶ 16.] Under SDCL ch 26–8A, DSS must make reasonable efforts to rehabilitate the family and make possible the child's return to the home of the parents. *See* SDCL 26–8A–21; 26–8A–26. In its dispositional findings of fact and conclusions of law, the trial court entered the following findings:

> The Department of Social Services has made reasonable efforts to reunite and rehabilitate the family including but not limited to the following; Establishing a family service agreement and case plan, setting up visits, setting up a psychological evaluation and drug and alcohol evaluation for the Mother, common sense parenting classes and bright start parenting classes, requesting a homestudy on Mother's parents.

A trial court's findings as to the issue of reasonable efforts are reviewed under the clearly erroneous standard of review. *See Matter of J.Y.*, 502 N.W.2d 860, 862 (S.D. 1993).

■ [¶ 17.] The record clearly supports the trial court's findings as to the services and programs made available to mother by DSS. However, mother relies strongly on her compliance with the case service plan and her cooperation with the services and programs provided to argue there is clear error in the determination that DSS's efforts at reunification were unsuccessful and that further efforts would be fruitless.

[¶ 18.] Unlike many abuse and neglect cases, there is no dispute that mother did cooperate with all of the requirements that DSS imposed upon her. However, the level of mother's cooperation is in dispute. While mother may have been overtly cooperative, her heart was not in the effort. As found by the trial court, "[m]other's psychological evaluation resulted in a fake good which made the results invalid. Mother has a history of denial and blame and further services would be unavailing and contrary to the best interest of the child."

[¶ 19.] In support of these findings, mother's psychologist testified at the dispositional hearing that mother's psychological evaluation was so skewed by her faking that it was "simply noninterpretable." When confronted with that result, mother turned her interview into "an hour of excusing and blaming." Thus, it was the psychologist's conclusion that he would not be able to produce any beneficial results from psychotherapy with mother and that mother had a "deeply entrenched pattern of refusing to take any responsibility or blame or seeing any need for therapy[.]" The psychologist believed it would be "quite a long haul" before he could even get past mother's defensiveness.

[¶ 20.] Mother's DSS case-worker corroborated this testimony. Although the case-worker agreed that mother completed or participated in the things that DSS asked her to do, he noted that mother had not been open and honest in all areas and never offered a plausible explanation for how child's injuries occurred or what could be done to correct the problem. Though mother took parenting classes, she questioned their importance and indicated they were unnecessary. The worker also found mother argumentative and testified that she would attempt to shift blame for her mistakes to the worker or to others. For these reasons, the case-worker became concerned as mother progressed through the case service plan and concluded that unless mother could explain child's injuries

it would be DSS's position to seek termination of her parental rights.

[¶ 21.] Based upon the foregoing evidence and testimony, the trial court was clearly supported in its findings concerning reasonable efforts by DSS and that, despite those efforts, the conditions that led to the removal of child were still in existence, that there was little likelihood conditions would be remedied so as to permit child to be returned to the custody of the parents, that further efforts would be fruitless and that it would be contrary to child's best interests and welfare to return child to mother or father's care.

### ISSUE THREE

[¶ 22.] **Was the trial court clearly erroneous in finding that the conditions that led to the removal of child still existed?**

[¶ 23.] Under SDCL 26–8A–26, if the court finds that all reasonable efforts have been made to rehabilitate the family and that the conditions that led to the removal of the child still exist with little likelihood of a remedy, the court may enter its order terminating parental rights.

[¶ 24.] Here, the trial court found:

8. The conditions which led to the removal of the child still exist. Father is in the South Dakota State Penitentiary and has been there since August of 2003. Mother has indicated that her relationship with father has ended; however, the Court does not find either parent credible. There is a strong likelihood that the parents will reconcile upon Father's release from prison. [Child] sustained a broken arm on one occasion and broken ribs on another occasion while in the care of both Mother and Father and both were responsible for the injuries.

9. There is little likelihood these conditions will be remedied to allow the child to be returned to the custody of the child's parent. The court finds extensive services have been provided to attempt to rehabilitate the family. Mother's psychological evaluation resulted in a fake good which made the results invalid. Mother has a history of denial and blame and further services would be unavailing and contrary to the best interests of the child.

[¶ 25.] These findings are clearly supported by evidence and testimony previously discussed. While mother contends the findings are clearly erroneous because father was incarcerated at the time of the dispositional hearing and she had terminated her relationship with him, the record reflects that mother maintained contact with father during his incarceration and that father was not even aware of the alleged termination of the relationship when he testified during the dispositional hearing. Moreover, father was expecting his release on parole approximately a month after the dispositional hearing. Thus, the trial court found that mother's testimony concerning a change of conditions regarding father and the termination of her relationship with him was self-serving and not credible.

[¶ 26.] The numerous findings of fact challenged by mother are not clearly erroneous. Although child's attorney objected to termination of parental rights during the trial court proceedings and on appeal, his objection was based on mother's alleged compliance with the case service plan and her completion of the "things DSS wanted her to do." Mother's compliance with the case service plan has been previously discussed in this decision and was an issue fully litigated before the trial court. Despite her claimed compliance,

the trial court entered its findings concerning a lack of changed conditions and concluded it would be "gambling with the future health and safety of [child] if she were to be returned to the custody of the parents." Notwithstanding the position of child's counsel on appeal, we hold that this conclusion is supported by the record.

[¶ 27.]  Affirmed.

[¶ 28.]  GILBERTSON, Chief Justice, and SABERS, KONENKAMP, ZINTER and MEIERHENRY, Justices, participating.